UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                          :
ALL AMERICAN TELEPHONE                    :
COMPANY, INC., *et al.*,                   :
                                          :
                    Plaintiffs,           :        07cv861
                                          :
          -against-                       :        OPINION & ORDER
                                          :
AT&T CORP.,                               :
                                          :
                    Defendant.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, Senior United States District Judge:

          This action involves a long-running dispute between telecommunications carriers

over access charges. Plaintiffs All American Telephone Company, Inc., Chase Com, and e-

Pinnacle Communications, Inc. are competitive local exchange carriers—in lay terms, local

telephone companies—operating in Utah and Nevada. Over a decade ago, Plaintiffs initiated an

action against AT&T to collect tariffed access charges. Plaintiffs also asserted claims under the

Federal Communications Act of 1934 (the "Communications Act") for AT&T's refusal to pay

the tariffed rates and for quantum meruit. In essence, Plaintiffs sought to recover unpaid access

charges that AT&T allegedly owed them for connecting long distance telephone calls carried by

AT&T in its capacity as an interexchange carrier. Unsurprisingly, AT&T has a different

perspective, counterclaiming that Plaintiffs violated the Communications Act by acting as

"sham" carriers created as part of a scheme to artificially generate long distance call volume—

and by extension, access charges that AT&T posits it should not be required to pay.

          Similar disputes have found their way into federal courts nationwide. And like

other judges, this Court saw fit to refer the key issues in this action to the Federal

Communications Commission (FCC) under the primary jurisdiction doctrine in recognition of the FCC's specialized expertise and the virtues of uniformity in telecommunications regulation. This action returned to this Court in 2017 following the FCC's issuance of two separate orders on liability and damages and the D.C. Circuit's resolution of an appeal of the FCC's order on damages. AT&T now moves for summary judgment dismissing Plaintiffs' Second Amended Complaint and granting relief on its counterclaims. For the reasons that follow, both of AT&T's motions are granted.

BACKGROUND

To assist in better understanding Plaintiffs' claims and AT&T's counterclaims, a brief primer on access charges and telecommunications carriers precedes a description of the relevant facts and extensive procedural history of this case.

I.      Regulatory Framework

The regulatory scheme that governs the fees that a carrier may recover from another carrier has been exhaustively detailed in myriad judicial opinions. This Opinion & Order draws primarily from the Ninth Circuit's 2018 decision in CallerID4u v. MCI Communications Services Inc. and the D.C. Circuit's 2017 decision resolving Plaintiffs' appeal of the FCC's damages order issued pursuant to this Court's primary jurisdiction referral.

When a long-distance call is placed, a local exchange carrier that operates in the caller's local service area (or "telephone exchange area") routes the call to an "interexchange carrier" (or "IXC" or "interstate exchange carrier"). All Am. Tel. Co., Inc. v. Fed. Commc'ns Comm'n ("All American III"), 867 F.3d 81, 84 (D.C. Cir. 2017). The interexchange carrier then delivers the call to the local exchange carrier that services the recipient's geographic area. All American III, 867 F.3d at 84. When the recipient's local exchange carrier completes the call, the

interexchange carrier must pay an access charge to the local exchange carriers for the connection service—i.e., the "originating" switched access service provided by the caller's local carrier and the "terminating" switched access service provided by the recipient's local carrier. All American III, 867 F.3d at 84.

The rate that a local exchange carrier may charge for switched access service depends on how the carrier is classified. Incumbent local exchange carriers (or "ILECs") are local exchange carriers that, "on or prior to February 8, 1996, provided service to a particular area or were part of an exchange carrier association." All American III, 867 F.3d at 84 (citing 47 U.S.C. § 251(h)). ILECs may only impose access charges by filing a tariff with the FCC that governs their rate structure. All American III, 867 F.3d at 84; All Am. Tel. Co. v. AT&T, Inc. ("All American I"), 2009 WL 691325, at *1 (S.D.N.Y. Mar. 16, 2009) (citing 47 U.S.C. § 203); see CallerID4u, Inc. v. MCI Commc'ns Servs. Inc., 880 F.3d 1048, 1058 (9th Cir. 2018) (explaining that ILECs are "both required to file tariffs and [are] also subject to FCC rate regulations").

On the other hand, all other local exchange carriers are competitive local exchange carriers (or "CLECs"). All American III, 867 F.3d at 84 (citing 47 C.F.R. § 51.903(a)). Following revisions to the FCC's permissive de-tariffing policy for CLECs in 2001, there are only "two means by which a CLEC can provide an IXC with, and charge for interstate access services." CallerID4u, Inc., 880 F.3d at 1059 (quotation mark omitted) (citing AT&T Servs. Inc. v. Great Lakes Comnet, Inc., 30 FCC Rcd. 2586, 2588 ¶ 10 (2015)). A CLEC may (1) under the benchmark rule, "tariff interstate access charges if its rates are no higher than the rates charged for such services by the competing ILEC" in the service area; or (2) privately "negotiate and enter into an agreement with an IXC to charge rates higher than those permitted

under the benchmark rule." <u>CallerID4U, Inc.</u>, 880 F.3d at 1059 (citation and quotation marks

omitted); <u>accord</u> <u>All American III</u>, 867 F.3d at 84 (citations omitted); <u>AT&T Corp. v. All Am.</u>

<u>Tel. Co. ("Liability Order")</u>, 28 FCC Rcd. 3477, 3480 ¶ 9 (2013).

   Where a tariff has been filed, a carrier may not deviate from the rates that apply to

the services set forth in the tariff. The "filed rate doctrine, also known as the filed tariff doctrine,

is derived from the tariff-filing requirements of . . . [§ 203 of the Communications Act] and

'forbids a regulated entity to charge rates for its services other than those properly filed with the

appropriate federal regulatory authority.'" <u>Marcus v. AT&T Corp.</u>, 138 F.3d 46, 58 (2d Cir.

1998) (citations omitted); <u>see also</u> <u>CallerID4u, Inc.</u>, 880 F.3d at 1052-53 (explaining that

§ 203(c) "prohibits common carriers from providing any interstate wire communications without

filing tariffs with the FCC, and prohibits common carriers from charging, demanding, collecting,

or receiving any compensation for such services except as specified in the carriers' filed tariffs").

   This litigation plays out in the arena of "access stimulation," sometimes referred

to as "traffic pumping." As explained by the D.C. Circuit, an access stimulation scheme works

like this:

> [A] local exchange carrier would enter into a contractual relationship with a
> company that generates a high volume of telephone calls, such as a conference
> calling provider or a provider of sexually explicit chat lines. The local carrier would
> house the phone-call-generating partner's equipment on its premises for free and
> would sometimes even provide the equipment itself at no cost. Not only would the
> local carrier forgo charging its partner for the phone calls that came in, but in fact
> the carrier would pay the partner a share of the per-minute long-distance access
> rates it charged the interexchange carriers.

<u>All American III</u>, 867 F.3d at 85.[1]

---

[1]   Senior United States District Judge James E. Gritzner of the Southern District of Iowa has provided a
detailed historical account of access stimulation litigation—including this action—in several comprehensive
opinions. <u>See, e.g.</u>, <u>AT&T Corp. v. Aventure Commc'ns Tech., LLC</u>, 207 F. Supp. 3d 962, 973-1004 (S.D. Iowa
2016); <u>Aventure Commc'ns Tech., LLC v. Sprint Commc'ns Co. L.P.</u>, 224 F. Supp. 3d 706, 718-48 (S.D. Iowa
2015); <u>Qwest Commc'ns Co. v. Aventure Commc'ns Tech., LLC</u>, 86 F. Supp. 3d 933, 947-76 (S.D. Iowa 2015).

Such an arrangement benefits the local exchange carrier by boosting its phone traffic and access charge revenue as well as the conference call/chat line provider by providing free service and part of the access charge revenue—all at the expense of the interexchange carriers, who had to pay artificially inflated access charges. All American III, 867 F.3d at 85. Starting in 2010, however, the FCC issued orders ruling that local exchange carriers could not bill interexchange carriers under their tariffs to connect long-distance calls to a non-paying end user—i.e., an access stimulation scheme is unlawful under §§ 201(b) and 203(c) if the conference call/chat line provider does not pay for the local exchange carrier's services. See All American III, 867 F.3d at 85 (citing FCC orders affirmed by the D.C. Circuit).

II.     Factual Background

The following facts are drawn from the FCC's orders pursuant to this Court's referral, on which the parties' Local Rule 56.1 statements primarily rely. Plaintiffs are CLECs who provide services exclusively to chat line/conference call providers in Utah and Nevada. Liability Order, 28 FCC Rcd. at 3478 ¶ 3. For purposes of this action, AT&T is an interexchange carrier that provides long-distance calling services. Liability Order, 28 FCC Rcd. at 3478 ¶ 2.

While not parties to this action, the cast is rounded out by Beehive Telephone Company, Inc. Nevada and Beehive Telephone Company, Inc. Utah ("Beehive"), ILECs that operate in rural Nevada and Utah, and Joy Enterprises ("Joy"), a Nevada chat line/conference call provider that All American served. Liability Order, 28 FCC Rcd. at 3478 ¶¶ 3-5. In 1994, Beehive was able to charge relatively high access rates under its tariff because its historic traffic volumes had been low. Liability Order, 28 FCC Rcd. at 3480 ¶ 10. Sometime between 1994 and the early 2000s, Beehive and Joy entered into an access revenue–sharing arrangement "in

5

which Beehive paid Joy a portion of Beehive's tariffed access charges for every minute of long distance traffic routed to Joy's assigned telephone numbers." <u>Liability Order</u>, 28 FCC Rcd. at 3480 ¶ 11. While the scheme inflated Beehive's traffic precipitously, that escalation in traffic also caused Beehive's tariff-determined local access charge rates to nosedive. <u>Liability Order</u>, 28 FCC Rcd. at 3480-81 ¶¶ 11-12.

To keep the access stimulation scheme running, the Beehive entities (which were ILECs) created Plaintiffs (which were CLECs) to serve as the terminating access carrier in Beehive's stead. <u>Liability Order</u>, 28 FCC Rcd. at 3481 ¶ 13. At the time of the scheme, CLECs could tariff switched access services at rates benchmarked against the competing ILEC's rates without incurring any rate reduction based on increases in traffic volume.[2] <u>Liability Order</u>, FCC Rcd. at 3481 ¶ 13, 3489 ¶ 27.

Beehive also assisted in choosing locations for Plaintiffs' equipment, installing and maintaining their equipment for free (which was collocated in Beehive's facilities), managing Plaintiffs' billing and collection, and providing other services—including filing revised tariffs for Plaintiffs after Beehive increased its own rates. <u>Liability Order</u>, 28 FCC Rcd. at 3483 ¶ 16. Despite being CLECs, All American provided services only to a single conference call/chat line provider, and Chase Com and e-Pinnacle exclusively serviced only a handful of providers. <u>Liability Order</u>, 28 FCC Rcd. at 3478 ¶ 3, 3483 ¶ 17. Prior to 2008, Plaintiffs did not own or lease any operating switches typically used to provide CLEC services to the public. <u>Liability Order</u>, 28 FCC Rcd. at 3483 ¶ 17.

---

[2]     Plaintiffs dispute this. (<u>See, e.g.</u>, Plaintiffs' Response to Defendant's Rule 56.1 Statement of Material Facts Relating to Summary Judgment on Second Amended Complaint, ECF No. 175 ("Plaintiffs' First Rule 56.1 Response") ¶ 28.) Nonetheless, this fact is immaterial to the disposition of the summary judgment motions. <u>See Dist. Attorney of N.Y. Cty. v. Republic of the Phil.</u>, 307 F. Supp. 3d 171, 188 (S.D.N.Y. 2018).

III.     Procedural History

      Plaintiffs'[3] First Amended Complaint sought to recover millions of dollars in unpaid access fees for access services that Plaintiffs allegedly provided to AT&T between 2005 and 2006 and which AT&T was required to pay under tariffs Plaintiffs filed with the FCC. Plaintiffs claimed that AT&T's unilateral refusal to pay contravened the filed rate doctrine and FCC orders prohibiting such self-help and constituted an unreasonable practice under the Communications Act.  In relevant part, the First Amended Complaint asserted claims under federal tariffs, §§ 201(b) and 203(c) of the Communications Act, and quantum meruit.  See All American I, 2009 WL 691325, at *1.

      In response, AT&T counterclaimed for (1) violations of Plaintiffs' federal tariffs and 47 U.S.C. § 203; (2) unreasonable practices in violation of 47 U.S.C. § 201(b) by billing for services not provided; (3) unreasonable practices in violation of 47 U.S.C. § 201(b) by operating as sham entities created to inflate access charges; (4) fraudulent and negligent misrepresentation; (5) unjust enrichment; and (6) civil conspiracy.  All American I, 2009 WL 691325, at *1.

A. S.D.N.Y. Decisions

      On July 24, 2008, this Court granted Plaintiffs' motion for judgment on the pleadings and dismissed AT&T's counterclaims based on the filed rate doctrine.  Upon reconsideration, this Court vacated its prior order on March 16, 2009 and denied Plaintiffs' motion for judgment on the pleadings and to strike AT&T's counterclaims.  See All American I, 2009 WL 691325, at *4.  However, it stayed AT&T's sham entity counterclaim under the primary jurisdiction doctrine and directed AT&T to advise as to whether it intended to

---

[3]      References to "Plaintiffs" in this Opinion & Order are to the CLECs that filed this action, regardless of their party status in the FCC proceedings.

commence a proceeding on that counterclaim before the FCC.

In January 2010, this Court granted Plaintiffs' motion to refer certain issues to the FCC under the primary jurisdiction doctrine. See All Am. Tel. Co. v. AT&T, Inc. ("All American II"), 2010 WL 7526933 (S.D.N.Y. Jan. 19, 2010). Under that doctrine, a federal court may refer "issues which, under a regulatory scheme, have been placed within the special competence of an administrative body" for that body's views before the court decides a claim requiring resolution of those issues. Mathirampuzha v. Potter, 548 F.3d 70, 83 (2d Cir. 2008). The issues, which were agreed upon by the parties and referred to the FCC on February 5, 2010, include (1) whether Plaintiffs provided switched access services pursuant to valid tariffs; (2) whether Plaintiffs provided some other regulated service, and if so, what rate ought to be applied; (3) whether Plaintiffs are entitled to compensation under a quantum meruit or similar theory; and (4) whether AT&T violated the Communications Act by refusing to pay the billed access charges. (ECF No. 89, Ex. A.)

B. FCC Decisions

Although the FCC opened two separate actions to effectuate this Court's referral, the relevant FCC proceeding is No. EC-09-MD-010, which the FCC bifurcated into liability and damages phases and for which it issued separate decisions.

1. Liability Order

The FCC issued the Liability Order on March 25, 2013, which held that Plaintiffs violated §§ 203 and 201(b) by "participating in an access stimulation scheme designed to collect in excess of eleven million dollars of improper terminating access charges from AT&T." Liability Order, 28 FCC Rcd. at 3477 ¶ 1.

First, the FCC found that Plaintiffs "were 'sham' CLECs created to 'capture

access revenues that could not otherwise be obtained by lawful tariffs,'" and billing AT&T for those access charges constituted an unjust and unreasonable practice under § 201(b). <u>Liability Order</u>, 28 FCC Rcd. at 3487-88 ¶ 24. The <u>Liability Order</u> also found that Plaintiffs "had no intention at any point in time to operate as <u>bona fide</u> CLECs or provide local exchange service to the public at large." <u>Liability Order</u>, 28 FCC Rcd. at 3488 ¶ 25. Specifically, they "neither owned nor leased facilities, nor did they purchase unbundled network elements typically used by CLECs to provide any telecommunications services to the public," but instead, they relied on the operational support of Beehive. <u>Liability Order</u>, 28 FCC Rcd. at 3488 ¶¶ 25-26. Callers were none the wiser—their calls were placed to the same conference/chat telephone numbers and were routed over the same Beehive facilities and equipment. <u>Liability Order</u>, 28 FCC Rcd. at 3489 ¶ 27. In short, the formation of Plaintiffs "allowed the access stimulation arrangements to continue at rates that [otherwise] would have been unsustainable." <u>Liability Order</u>, 28 FCC Rcd. at 3489 ¶ 27.

Second, the <u>Liability Order</u> determined that Plaintiffs violated §§ 203 and 201(b) "by billing AT&T for access services that they did not provide pursuant to valid and applicable interstate tariffs." <u>Liability Order</u>, 28 FCC Rcd. at 3492 ¶ 34. Specifically, the FCC found that Plaintiffs' tariffs did not apply to the interstate traffic for which Plaintiffs billed AT&T. <u>Liability Order</u>, 28 FCC Rcd. at 3492 ¶ 35, 3493 ¶ 36. The <u>Liability Order</u> also concluded that Plaintiffs did not provide switched access service within the meaning of their tariffs because the conference call/chat line providers were not "end users" as defined in the tariffs, such that Plaintiff could not be said to "terminate" calls to end users. <u>Liability Order</u>, 28 FCC Rcd. at 3494 ¶ 38.

2. Damages Order

On August 21, 2015, the FCC released the <u>Damages Order</u>, which awarded AT&T $252,496.37 in damages—<u>i.e.</u>, the amount that AT&T had paid to Plaintiffs for services they billed but did not provide. See <u>AT&T Corp. v. All Am. Tel. Co. ("Damages Order")</u>, 30 FCC Rcd. 8958, 8958 ¶ 1, 8960 ¶ 5 (2015). In the <u>Damages Order</u>, the FCC reiterated that Plaintiffs did not provide any access services, but that "Beehive furnished the access services over its facilities and equipment [and] . . . issued bills for the service to AT&T" under Plaintiffs' names. <u>Damages Order</u>, 30 FCC Rcd. at 8959 ¶ 3; <u>see also</u> <u>Damages Order</u>, 30 FCC Rcd. at 8962 ¶ 11 (recounting Plaintiffs' "admi[ssion] that they did not provide AT&T with access services and that Beehive did"); <u>Damages Order</u>, 30 FCC Rcd. at 8964 ¶ 16 (noting that the <u>Liability Order</u> reached the conclusion "that [Plaintiffs] did not provide any services to AT&T because they did not own or lease any switches" typically used to provide access services to the public).

In relevant part, the FCC also made the following observations regarding the state law claims:

[¶] 13. [Plaintiffs] contend that AT&T's supplemental complaint should be dismissed because AT&T would be unjustly enriched if the Commission were to award damages. But [Plaintiffs] have demonstrated neither that they may plead equitable defenses in a Section 208 complaint proceeding, nor that they may seek equitable relief relating to matters subject to regulation. <u>Even assuming they could make these arguments, [Plaintiffs] have failed to establish the necessary elements for unjust enrichment, because they did not provide a service to, or confer a benefit on, AT&T.</u> [Plaintiffs] contend in this damages proceeding that, as "billing/sales agents" of Beehive, they "have the right to be compensated [by AT&T] for the role they played in causing the Beehive service to be provided to AT&T." Their assertion is unsupported by the record, however.
. . .

[¶] 21. The remaining issues that the Court referred are predicated on the assumption that [Plaintiffs] provided a service to AT&T. <u>Because we found in the Liability Order that [Plaintiffs] did not provide any service to AT&T</u>, those issues

have no bearing on [Plaintiffs'] entitlement to compensation, and we therefore dismiss them as moot.

Damages Order, 30 FCC Rcd. at 8962 ¶ 13, 8966 ¶ 21 (emphasis added).

While Plaintiffs did not appeal the Liability Order or the FCC's denial of their petition for reconsideration of the Liability Order, see AT&T Corp. v. All Am. Tel. Co., 29 FCC Rcd. 6393 (2014), they appealed the Damages Order.

C. D.C. Circuit Opinion and Subsequent Proceedings

On August 11, 2017, the D.C. Circuit upheld the FCC's damages award, but vacated those portions of the Damages Order "touching on the merits of [Plaintiffs'] state-law claims." All American III, 867 F.3d at 89. Specifically, the D.C. Circuit took issue with portions of the Damages Order that discussed Plaintiffs' "ability to satisfy the 'necessary elements for unjust enrichment' and [the FCC's] determination that the quantum meruit claims referred to the [FCC] were 'moot[ed]'" by its finding that Plaintiffs did not provide any service to AT&T. All American III, 867 F.3d at 95 (internal citations omitted) (third alteration in original). These conclusions, the D.C. Circuit held, were "improper and ultra vires to the extent that they addressed [Plaintiffs'] state-law-claims." All American III, 867 F.3d at 95.

Thereafter, Plaintiffs filed a Second Amended Complaint abandoning their claims under federal and state tariffs and the Communications Act. The revised pleading left only two state law claims in play—unjust enrichment and quantum meruit. (See Second Amended Complaint, ECF No. 158 ("Compl.").) The gravamen of the state law claims is that AT&T received $13 million in terminating switched access service, which Plaintiffs claim to have played some role in providing, either by working with Beehive to provide those services and/or causing those services to be provided. (See Compl. ¶¶ 107-123.)

<u>LEGAL STANDARD</u>

I.      <u>Summary Judgment</u>

As an initial matter, Plaintiffs oppose AT&T's summary judgment motions in part because they fail to satisfy New York's summary judgment standard under CPLR § 3212. However, CPLR § 3212 and the New York case authority interpreting and applying that standard do not apply. A federal court sitting in diversity must apply state substantive law and federal procedural law. <u>Hanna v. Plumer</u>, 380 U.S. 460, 465 (1965) (citation omitted). As courts in this Circuit have held, the summary judgment standard is procedural, and there is a federal procedural rule on point—<u>i.e.</u>, Rule 56. <u>See</u> <u>Allianz Ins. Co. v. Lerner</u>, 416 F.3d 109, 118 (2d Cir. 2005) (observing that "New York state procedural rules do not apply here to a federal court sitting in diversity").

Under Rule 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories on file, together with the affidavits, if any, show there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). In deciding a motion for summary judgment, a court construes the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in its favor. <u>See</u> <u>Niagara Mohawk Power Corp. v. Jones Chem., Inc.</u>, 315 F.3d 171, 175 (2d Cir. 2003).

The moving party "bears the initial burden of showing why it is entitled to summary judgment." <u>Salahuddin v. Goord</u>, 467 F.3d 263, 272 (2d Cir. 2006) (citing <u>Celotex</u>, 477 U.S. at 323). Where the non-movant bears the burden of proof at trial, the movant may show <u>prima facie</u> entitlement to summary judgment by pointing to evidence that negates the non-

movant's claims or by pointing to a lack of evidence for the trier of fact on an essential element

of the non-movant's claim.  Salahuddin, 467 F.3d 172-73; CILP Assocs., L.P. v.

PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013).  If the movant makes this

showing, the burden shifts to the non-movant to "point to record evidence creating a genuine

issue of material fact."  Salahuddin, 467 F.3d at 173.  Finally, it is insufficient for the movant to

simply deny the allegations in the opponent's pleadings, just as the non-movant cannot rest on

the allegations in its pleadings.  Salahuddin, 467 F.3d at 173.

II.     Primary Jurisdiction

Following a referral to the FCC under the primary jurisdiction doctrine, the

parties also dispute the extent to which this Court must defer to the FCC's legal and factual

findings.  On one hand, AT&T contends that this Court is expected—if not required—to follow

the FCC's factual and/or legal determinations, subject to the caveat that this Court must decide

the merits of the state law claims.  Plaintiffs adopt a less deferential tack, arguing that the FCC's

orders do not prevent this Court from recognizing Plaintiffs' statements of fact because the FCC

lacked authority to make factual determinations dispositive of the state law claims.

It is clear that some degree of deference must be afforded a determination "made

by an agency to which a court initially deferred under the doctrine of primary jurisdiction[;]

otherwise, the doctrine would be meaningless."  Golden Hill Paugussett Tribe of Indians v. Rell,

463 F. Supp. 2d 192, 197 (D. Conn. 2006).  The primary jurisdiction doctrine contemplates a

division of labor between courts and administrative agencies to promote uniformity in the

regulation of a sphere entrusted to an agency and in recognition of the special competence of

agencies in resolving particular issues.  See Johnson v. Nyack Hosp., 86 F.3d 8, 11 (2d Cir.

1996) (explaining that "a court defers to the agency for advisory findings" under the doctrine,

which applies "where a claim, though 'originally cognizable in the courts,' is better suited for a specialized administrative body'"). Thus, at minimum, courts in this Circuit have found it appropriate to defer to the factual findings of an administrative body to which a matter has been referred under the primary jurisdiction doctrine while retaining the ultimate authority to adjudicate the claim. United States v. 43.47 Acres of Land, 896 F. Supp. 2d 151, 157-58 (D. Conn. 2012), aff'd sub nom. Schaghticoke Tribal Nation v. Kent Sch. Corp., 595 F. App'x 32, 34-35 (2d Cir. 2014) (endorsing such an approach); accord Golden Hill, 463 F. Supp. 2d at 198.

To be sure, this case raises an additional wrinkle because exclusive authority to review final FCC orders is generally vested in the courts of appeals. See 47 U.S.C. § 402(a); 28 U.S.C. § 2342(1). Precedent from sister Circuits recognizes that when a district court properly refers an issue to an agency under the primary jurisdiction doctrine and exclusive authority to review the agency's determination is vested in a court other than the referring court, the district court is bound by the determinations of the agency and cannot review the merits of those determinations. See United States v. Gen. Dynamics Corp., 828 F.2d 1356, 1360 (9th Cir. 1987) (citing Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 64 (1970)); MCI Telecomms. Corp. v. Teleconcepts, Inc., 71 F.3d 1086, 1103 (3d Cir. 1995); accord Locust Cartage Co. v. Transamerican Freight Lines, Inc., 430 F.2d 334, 341 (1st Cir. 1970) (finding that district court erred in substituting its own findings and conclusions, and that "[w]hen the [agency] resolves a question within its primary jurisdiction, its resolution should not be set aside unless it exceeds the [agency's] statutory authority or is unsupported by substantial evidence").

Accordingly, this Court finds it appropriate to defer to the FCC's determinations except to the extent that they impermissibly usurp the ultimate authority to adjudicate the merits

of Plaintiffs' state law claims.  <u>Accord</u> 33 Fed. Prac. & Proc. Judicial Review § 8400 (1st ed.)

(explaining that while "[t]he court's decision may be dictated by the agency's decision on certain

issues in the controversy[,] . . . the complete decision is nonetheless still the court's").  Stated

differently, while this Court should defer to the FCC's factual determinations (and its legal

determinations insofar as they relate to whether certain practices violate the Communications

Act), it must determine the legal import of those findings on Plaintiffs' state law claims in the

first instance.  <u>Cf.</u> <u>VoiceStream Wireless Corp. v. All U.S. Commc'ns</u>, 149 F. Supp. 2d 29, 34

(S.D.N.Y. 2001) (citing <u>Far E. Conference v. United States</u>, 342 U.S. 570, 574 (1952)) ("Referral

is appropriate 'even though the facts after they have been appraised by such specialized

competence [will] serve as a premise for legal consequences to be judicially defined.").

Substituting this Court's own determination of issues properly referred to the FCC would

otherwise amount to an impermissible appellate review of the FCC's decisions.

DISCUSSION

I.      <u>AT&T's Motion for Summary Judgment on Plaintiffs' State Law Claims</u>

AT&T contends that it is entitled to dismissal of Plaintiffs' complaint as a matter

of law for three reasons.  First, it argues that the FCC's regulatory regime preempts Plaintiffs'

state law unjust enrichment and <u>quantum meruit</u> claims.  Second, AT&T asserts in the alternative

that the equitable doctrine of unclean hands bars Plaintiffs from proceeding with the unjust

enrichment and <u>quantum meruit</u> claims.  Finally, it maintains that Plaintiffs' state law claims fail

on the merits because Plaintiffs conferred no benefit on AT&T.

A.      <u>Prematurity of Summary Judgment</u>

Before turning to Plaintiffs' state law claims, this Court first addresses Plaintiffs'

assertion that AT&T's motions for summary judgment are premature because no discovery has

been taken on their state law claims and the motions were filed before an answer was interposed. As a threshold matter, Plaintiffs' claim that summary judgment may not be granted before an answer is filed or discovery is conducted is incorrect.  See Fed. R. Civ. P. 56(b) (permitting any party to "file a motion for summary judgment until 30 days after the close of all discovery"); cf. Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 303-04 (2d Cir. 2003) (reiterating that "[o]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery" (quotation marks and citation omitted)).

       Rather, Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," the court may defer decision on the motion, deny the motion, allow additional time to take discovery, or issue any other appropriate order.  Fed. R. Civ. P. 56(d).  In this Circuit, a sufficient Rule 56(d) affidavit "must include the nature of the uncompleted discovery; how the facts sought are reasonably expected to create a genuine issue of material fact; what efforts the affiant has made to obtain those facts; and why those efforts were unsuccessful."  Paddington Partners v. Bouchard, 34 F. 3d 1132, 1138 (2d Cir. 1994); see also Alphonse Hotel Corp. v. Tran, 828 F.3d 146, 151 (2d Cir. 2016) (citation omitted) (explaining that "[a] party seeking to delay resolution of a summary judgment motion on grounds that he has been deprived of certain discovery materials 'must show that the material sought is germane to the [issues before the court], and that it is neither cumulative nor speculative . . . .").

       Here, Plaintiffs' showing falls short of the Rule 56(d) standard.  Specifically, Plaintiffs submitted an affidavit seeking the following discovery:

       [T]he business and technical procedures used by AT&T to route traffic to the chat-line and conference operators associated with Plaintiffs; . . . the revenues generated to AT&T when its long distance and cellular customers made calls to the chat-line and conference operators associated with Plaintiffs; . . . the extent to which such

revenues were enhanced by bulk transmission purchase agreements that AT&T held with traffic aggregators; . . . amounts paid by AT&T to incumbent and competitive local exchange carriers engaged in access stimulation[;] . . . [and] documents discussing the economic impact on AT&T of refusing to pay for access services associated with access stimulation . . . .

(See Affidavit of Jonathan E. Canis Regarding Discovery, ECF No. 173 ("Canis Aff."), ¶ 4.) According to the affidavit, Plaintiffs require this discovery "to support their claims," stating that "[a]ll of these materials and related information are probative of the elements of quantum meruit and unjust enrichment claims, as well as Plaintiffs' affirmative defenses and counterclaims against claims made by AT&T." (Canis Aff. ¶¶ 3-5.) Finally, Plaintiffs attest that the requested discovery is "solely in the possession of and under the control of AT&T." (Canis Aff. ¶ 7.)

But this requested discovery does not appear to bear on the issues central to preemption or the merits of Plaintiffs' state law claims,[4] such as whether and to what extent they provided switched access service (or any service) to AT&T—nor do Plaintiffs explain how this discovery is germane to whether Plaintiffs' state law claims are barred by the unclean hands defense. Similarly, the discovery that Plaintiffs seek is not facially relevant to AT&T's counterclaims under the Communications Act, which focus on Plaintiffs' conduct. Further, Plaintiffs "fail[] to explain with any specificity 'how the facts sought are reasonably expected to create a genuine issue of material fact'" such that a reasonable jury could find in Plaintiffs' favor either on their state law claims or on AT&T's counterclaims. See Alphonse Hotel Corp., 828 F.3d at 152 (citing Paddington Partners, 34 F.3d at 1138). Ultimately, Plaintiffs' affidavit fails because it simply identifies categories of discovery in the hands of AT&T that Plaintiffs claim

---

[4]     A "determination regarding preemption is a conclusion of law." Island Park, LLC v. CSX Transp., 559 F.3d 96, 101 (2d Cir. 2009) (citation omitted); see also N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health, 509 F. Supp. 2d 351, 354-55 (S.D.N.Y. 2007) (observing that "preemption is a legal question for the Court to decide" and is thus ripe for summary judgment); Retail Indus. Leaders Ass'n v. Suffolk Cty., 497 F. Supp. 2d 403, 410 (E.D.N.Y. 2007) (same).

support their claims and affirmative defenses.  See Alphonse Hotel Corp., 828 F.3d at 151 ("[A]

bare assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant

is insufficient." (citation and quotation marks omitted)).

Finally, there is no serious contention that Plaintiffs provided any other service or

benefit to AT&T aside from access services.  At oral argument, Plaintiffs' counsel surmised that

Plaintiffs may have acted as sales or billing agents for Beehive, ostensibly by brokering

connections with conference call/chat service providers that AT&T's customers wanted to call.

(Oral Arg. Tr., ECF No. 181, at 31:6-17.)  Counsel also represented that while such a theory was

not based on any discovery, the FCC conceded on appeal to the D.C. Circuit that additional

discovery could support such a theory.  But Rule 56(d) is meant to shield a party against the

entry of summary judgment where it has not had an adequate opportunity to defend—a party

cannot weaponize Rule 56(d) to fish for evidence in hopes of finding out whether it has a claim.

See Robinson v. Allstate, 706 F. Supp. 2d 320, 329 (W.D.N.Y. 2010); see also Paddington

Partners, 34 F.3d at 1138 (characterizing party's argument "that it should be allowed to find out

if it has a claim, rather than that it has a claim for which it needs additional discovery" as a

"divagation [that] is decidedly not the object of the discovery procedures outlined in the Federal

Rules of Civil Procedure").  In any event, discovery relating to what services Plaintiffs provided

would most naturally be within their possession or control.

For these reasons, Plaintiffs' attempt to delay the resolution of AT&T's summary

judgment motions on the basis of inadequate discovery is rejected.  Cf. Gurary v. Winehouse,

190 F.3d 37, 43-44 (2d Cir. 1999) (noting that the failure to file an affidavit in accord with the

Federal Rules is fatal to a claim regarding the inadequacy of discovery on summary judgment).

B. <u>State Law Claims</u>

Plaintiffs' sole remaining claims are those for <u>quantum meruit</u> and unjust enrichment under state law. The parties' briefs apply New York law, and such implied consent sufficiently establishes the applicable choice of law. <u>Trikona Advisers Ltd. v. Chugh</u>, 846 F.3d 22, 31-32 (2d Cir. 2017). To prevail on a <u>quantum meruit</u> claim in New York, a plaintiff must establish "(1) performance of services in good faith, (2) acceptance of services by the person to whom they are rendered, (3) expectation of compensation therefor, and (4) reasonable value of the services rendered." <u>Evans-Freke v. Showcase Contracting Corp.</u>, 926 N.Y.S.2d 140, 141 (N.Y. App. Div. 2011). An unjust enrichment claim requires a plaintiff to demonstrate "'that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered.'" <u>Georgia Malone & Co. v. Rieder</u>, 973 N.E.2d 743, 746 (N.Y. 2012) (citation omitted). Though these quasi-contract causes of action have "nominally different elements," <u>In re Coudert Bros.</u>, 487 B.R. 375, 396 (S.D.N.Y. 2013), the Second Circuit has "analyze[d] <u>quantum meruit</u> and unjust enrichment together as a single quasi contract claim," <u>Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.</u>, 418 F.3d 168, 175 (2d Cir. 2005) (citing <u>Newman & Schwartz v. Asplundh Tree Expert Co.</u>, 102 F.3d 660, 663 (2d Cir. 1996)). For purposes of this motion, this Court analyzes Plaintiffs' claims in tandem because "both are claims under 'a contract implied . . . in law to pay reasonable compensation.'" <u>Snyder v. Bronfman</u>, 921 N.E.2d 567, 569 (N.Y. 2009) (citation omitted).

AT&T principally contends that Plaintiffs fail to establish an essential element of their claims based on FCC determinations that they played no role in providing services or benefits of any kind to AT&T. (State Law Claims Motion, at 20.) In particular, AT&T points to

the FCC's findings that (1) Plaintiffs did not own or lease any switches or facilities typically used to provide local telecommunications services to the public; (2) Plaintiffs had no intention of providing local telecommunications services to the public; (3) and Beehive provided the access services over its facilities and equipment while billing for the services under Plaintiffs' names. In essence, AT&T contends that Plaintiffs were created solely as conduits enabling them to charge higher rates than Beehive could otherwise charge for the same call volume. In relevant part, Plaintiffs attempt to rebut AT&T's prima facie showing based on the FCC's recognition— as interpreted by Plaintiffs—that they played at least some role in providing access services in tandem with Beehive or causing access services to be provided to AT&T.

Admittedly, the Liability Order and Damages Order are not paragons of clarity as to whether the FCC determined that Plaintiffs provided no access services at all or that Plaintiffs did provide (or had some role in providing) access services that fell outside the terms of their tariffs. A fair reading of the Liability Order suggests that Plaintiffs did—as they insist—provide access services or have some role in doing so. See, e.g., Liability Order, 28 FCC Rcd. at 3484 n.70 (noting that "although [Plaintiffs] provided some CLEC services, they did not do so to the public at large" or in accord with the terms of their tariffs); Liability Order, 28 FCC Rcd. at 3478 ¶ 3, 3483 ¶ 17, 3488 ¶ 25 (describing how Plaintiffs "provided services" in Nevada and Utah exclusively to a handful of conference call/chat line providers, but did not own or lease the facilities and equipment typically used to provide services to the public).

But these statements are arguably in tension with the Damages Order's recapitulation that "Beehive furnished the access services over its facilities and equipment" and "issued bills for the services to AT&T under [Plaintiffs'] names." Damages Order, 30 FCC Rcd. at 8959 ¶ 3; see also Damages Order, 30 FCC Rcd. at 8962 ¶ 11 (noting that "[Plaintiffs] admit

that they did not provide AT&T with access services and that Beehive did"); <u>Damages Order</u>, 30

FCC Rcd. at 8965 ¶ 16 & n.68 (characterizing the <u>Liability Order</u> as finding "that [Plaintiffs]

served only chat line/conferencing providers and did not provide access services" because "they

did not own or lease any switches").  Nevertheless, resolving any ambiguities in Plaintiffs' favor,

this Court concludes that there is no genuine dispute of material fact to be decided by a jury

because Plaintiffs' state law claims are preempted.  <u>Cf.</u> <u>Chertkova v. Conn. Gen. Life Ins. Co.</u>,

92 F.3d 81, 87 (2d Cir. 1996) ("No genuine issue exists if . . . after drawing all inferences and

resolving all ambiguities in favor of the non-movant, it appears that the evidence supporting the

non-movant's case is so scant that a rational jury could not find in its favor.").

        1.  <u>Plaintiffs' Procedural Arguments</u>

Before wading into the merits of preemption, this Court first considers two

threshold arguments advanced by Plaintiffs.  The first is easily disposed of.  Plaintiffs

proclaim—without citing to any legal authority—that AT&T waived the preemption argument

by failing to plead it in the proceedings before the FCC.  Separate from lacking legal support for

their assertion, however, Plaintiffs are simply incorrect on the facts.  As the FCC noted, "[t]he

Commission directed the parties to effectuate [this] Court's referral by filing two formal

complaints."  <u>Liability Order</u>, 28 FCC Rcd. at 3477 n.1.  Both AT&T's liability-phase complaint

and its supplemental damages-phase complaint plainly assert that the Communications Act

preempts Plaintiffs' claims for <u>quantum meruit</u> and unjust enrichment.  (Declaration of Jonathan

E. Canis, ECF No. 174 ("Canis Decl."), Ex. 11 ("AT&T's FCC Compl.") ¶¶ 119-120, 140-141;

Canis Decl., Ex. 12 ¶¶ 7, 77, 79-83, 89, 110, 124.)  At this stage, these facts are sufficient to

foreclose Plaintiffs' waiver argument.

Equally unpersuasive is Plaintiffs' contention that AT&T is judicially estopped

from asserting that the FCC's regulatory scheme preempts state law claims. Plaintiffs argue that AT&T took contrary positions in other proceedings in its capacity as a CLEC and purportedly conceded to the D.C. Circuit in this action "that no preemption took place." (See Memorandum of Plaintiffs in Opposition to Defendant's Motions for Summary Judgment on Plaintiffs' Second Amended Complaint & Defendant's Counterclaims, ECF No. 172 ("Plaintiffs' Opp."), at 21-24.)

Judicial estoppel is a discretionary doctrine "designed to 'protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" United States v. Apple, Inc., 791 F.3d 290, 337 (2d Cir. 2015) (citing New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001)). Although the propriety of the doctrine depends "heavily on the 'specific factual context[]'" of the case, courts generally consider (1) whether the party's argument or position is "clearly inconsistent with its earlier position"; (2) whether the party "succeeded in persuading a court to accept that earlier position"; and (3) whether the "party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." Apple, Inc., 791 F.3d at 337. The mere existence of a prior inconsistent position and adoption of that position by a tribunal, while necessary, are not sufficient, and a court must "inquire into whether the particular factual circumstances of a case 'tip the balance of equities in favor of doing so." Clark v. All Acquisition, LLC, 886 F.3d 261, 266-67 (2d Cir. 2018) (citation omitted).

Judicial estoppel is unwarranted because AT&T's prior positions are far from inconsistent with its position on preemption. For positions to be inconsistent, there must be "a true inconsistency between the statements in the two proceedings," and "if the statements can be reconciled, there is no occasion to apply an estoppel." Simon v. Safelite GlassCorp., 128 F.3d 68, 72-73 (2d Cir. 1997); see Apple, Inc., 791 F.3d at 337 (emphasizing the need to "carefully

consider the contexts in which apparently contradictory statements are made to determine if there is, in fact, direct and irreconcilable contradiction" (quotation marks and citation omitted)). Plaintiffs contend that AT&T "admitted no preemption took place" based on assertions it made in the FCC proceedings. Obviously, such a characterization—if accurate—would directly contradict the position AT&T takes here. But Plaintiffs mischaracterize AT&T's comments, in which it merely agreed with the unremarkable proposition that the FCC lacked the jurisdiction to entertain the merits of state law quasi-contract claims. Plaintiffs do not explain—and this Court cannot readily ascertain—how statements on the scope of the FCC's adjudicatory authority bear any connection to issues of preemption. Likewise, Plaintiffs' reliance on instances where AT&T pleaded quasi-contract claims in the alternative to contract claims in its own collection actions is misplaced. These positions on whether contract and quasi-contract claims may be asserted in the alternative at the pleading stage simply have nothing to do with preemption.

2. Law of Preemption

The doctrine of preemption reflects the Supremacy Clause's core mandate that federal law prevails in case of a conflict with state law. U.S. Const. art. VI, cl. 2; see Murphy v. Nat'l Collegiate Athletic Ass'n, 138 S. Ct. 1461, 1479-80 (2018) ("Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted.") In general, three types of preemption exist: "(1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local

law is an obstacle to the achievement of federal objectives." Figueroa v. Foster, 864 F.3d 222, 227-28 (2d Cir. 2017) (citation and quotation mark omitted). Preemption is "ultimately a question of statutory construction," and courts "look to the intent of Congress to determine the preemptive force of a statute" and the agency's intent "in evaluating preemption by a regulation." N.Y. Pet Welfare Ass'n, Inc. v. City of New York, 850 F.3d 79, 87 (2d Cir. 2017) (internal citations and quotations omitted). Finally, the "same 'ordinary pre-emption principles' [apply] whether the relevant federal law is a statute or a regulation." N.Y. Pet Welfare Ass'n, Inc., 850 F.3d at 87.

The party "asserting that federal law preempts state law bears the burden of establishing preemption." In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liability Litig., 725 F.3d 65, 96 (2d Cir. 2013). Here, AT&T predicates its preemption arguments on conflict preemption. (See State Law Claims Motion at 10 n.12; Reply Memorandum of AT&T in Support of Motions for Summary Judgment, ECF No. 179 ("AT&T's Reply"), at 3 n.4.) The burden to establish impossibility is demanding and requires a showing that compliance with federal and state law is a "physical impossibility," when state law "penalizes what federal law requires," or when state law claims "directly conflict with federal law." In re MTBE, 725 F.3d at 97 (quotation marks omitted) (collecting Supreme Court authority). Demonstrating that state law poses an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress" is also heavy and requires an "'actual conflict' with the overriding federal purpose and objective" and requires the "repugnance or conflict [to be] so direct and positive that the two acts cannot be reconciled or consistently stand together." In re MTBE, 725 F.3d at 101-02 (citations and quotation marks omitted). For all preemption analysis, "the purpose of Congress is the ultimate touchstone." Wyeth v. Levine, 555 U.S. 555, 565 (2009).

Finally, while this Circuit typically applies a presumption against preemption in areas traditionally entrusted to the states, the presumption generally does not apply to a sphere "where there has been a history of significant federal presence," N.Y. SMSA Ltd. P'ship v. Town of Clarkstown, 612 F.3d 97, 104 (2d Cir. 2010), such as the regulation of long-distance telecommunications, Ting v. AT&T, 319 F.3d 1126, 1136 (9th Cir. 2003).

3. Preemption of Plaintiffs' State Law Claims

Fundamentally, AT&T contends that Plaintiffs' quantum meruit and unjust enrichment claims are barred because the FCC's extensive regulatory regime exclusively governs the rates that a local exchange carrier may charge an interexchange carrier for completing a long-distance call. Specifically, AT&T argues that CLECs may impose access charges only by tariff or by contracting with the interexchange carrier, and that any attempt to recover compensation for access services under an unjust enrichment or quantum meruit theory impermissibly conflicts with the FCC's regulatory regime. Plaintiffs counter that federal telecommunications law does not foreclose the equitable recovery of reasonable fees in the absence of a tariff or contract, even in access stimulation cases.

In support of their positions, the parties cite a dizzying array of district court decisions and FCC orders landing on both sides of the preemption issue. They also dispute the extent to which the weight of authority favors their positions. On one hand, AT&T boasts that "virtually all courts" have dismissed similar state law claims as a matter of law and that it is unaware of any court that has awarded compensation for access services based on similar state law claims. (Memorandum of AT&T in Support of Motion for Summary Judgment on Plaintiffs' Second Amended Complaint, ECF No. 160 ("State Law Claims Motion"), at 14 & nn.17, 18 (collecting cases).) AT&T's position has not gone unnoticed by judges in other

districts.  See Great Lakes Commc'n Corp. v. AT&T Corp., 2015 WL 12551192, at *23 (N.D. Iowa June 8, 2015) (remarking that the CLEC "points to no case where these types of state law claims were actually entertained by a court," and that "[t]here is substantial authority supporting AT&T's argument that [the CLEC's] state law claims must be denied"); Qwest Commc'ns Co. v. Aventure Commc'ns Techs., LLC , 86 F. Supp. 3d 933, 1026 (S.D. Iowa 2015) ("It defies credulity that the LECs continue to maintain, despite consideration of these very traffic pumping cases by various tribunals, that the resounding theme at the very core of the matter—if the tariff access charges do not apply, are the LECs nonetheless entitled to some compensation—has somehow been missed by all these tribunals.  It has not; the answer is no.").  In response, Plaintiffs do not substantively address AT&T's cases.  Instead, they simply assert that a "similar" number of cases have arrived at the opposite conclusion.  (Plaintiffs' Opp. at 19.)  Based on a review of the relevant case authority, Plaintiffs overstate the extent to which courts are in equipoise.  But while the weight of authority favors AT&T, a superficial tallying of cases obscures the greater persuasiveness of AT&T's position.

The divergent conclusions reached by the cases cited by the parties may be reconciled in large part by accounting for when those decisions were issued, especially relative to the then-existing FCC guidance.  Viewed through this lens, Plaintiffs' invocation of three 2010 district court decisions that note the disagreement among courts as to whether a CLEC may recover for services outside of its tariff under quasi-contractual theories is unpersuasive because those decisions merely offer a snapshot as to the uncertainty engendered by the unclear agency guidance at that time.  See Qwest Commc'ns Co. LLC v. Tekstar Commc'ns Inc., 2010 WL 2772442, at *7 (D. Minn. July 12, 2010); Splitrock Props., Inc. v. Sprint Commc'ns Co. Ltd. P'ship, 2010 WL 1329634, at *9 (D.S.D. Mar. 30, 2010); Sancom, Inc. v. Qwest Commc'ns

Corp., 2010 WL 960005, at *10 (D.S.D. Mar. 12, 2010).

Additional context is warranted to better understand the underpinnings of this uncertainty.  In the decade and a half leading up to the passage of the Telecommunications Act of 1996, the FCC experimented with the de-tariffing of non-dominant carriers to promote competition in the telecommunications market, trusting that "'market forces and the administration of the complaint process' could guarantee reasonable rates without the lure of collusive pricing incentives inherent in the filed rate mechanism."  See Ting, 319 F.3d at 1132 (citations omitted) (remarking that "some began to argue that the continuation of extensive tariff filing only imposed unnecessary costs on new entrants and facilitated collusive pricing").  Following judicial rejection of the FCC's deregulatory efforts as unauthorized by the statutory scheme, Congress passed the Telecommunications Act of 1996, vesting the FCC with "authority to forbear from enforcing § 203's tariff-filing requirements."  CallerID4u, Inc., 880 F.3d at 1057.  The FCC—while not imposing mandatory de-tariffing for CLECs, under which they would be prohibited from filing tariffs—adopted a mandatory de-tariffing policy, under which CLECs were "subject to the tariff-filing requirement in § 203 unless they entered into negotiated agreements with IXCs."  CallerID4u, Inc., 880 F.3d at 1058.  In 2001, the FCC revised its CLEC-tariffing policy to address concerns that CLECs could file tariffs that set "unreasonably high switched access rates that were 'subject neither to negotiation nor to regulation designed to ensure their reasonableness.'"  CallerID4u, 880 F.3d at 1058 (citing In re Access Charge Reform, 16 FCC Rcd. 9923, 9924-25 (2001)).

Thus, following the FCC's 2001 In re Access Charge Reform decision, CLECs could only impose access charges benchmarked to the rate that the competing ILEC could charge by filing a tariff, or alternatively, impose higher rates by negotiating an agreement with the

interexchange carrier. But courts subsequently grappled with the implications of the FCC's permissive de-tariffing regime for the filed rate doctrine, and specifically, whether the doctrine barred local exchange carriers from obtaining compensation under equitable theories from interexchange carriers who received services not covered by a tariff. In part, this uncertainty appears traceable to a comment made in a 2009 FCC order on reconsideration, which this Court refers to as Farmers II in accord with the nomenclature adopted by other courts. See Qwest Commc'ns Corp. v. Farmers & Merchs. Mut. Tel. Co., 24 FCC Rcd. 14801 (2009).

Prior to Farmers II, courts had routinely applied the filed rate doctrine to bar local exchange carriers from collecting charges for services not covered by filed tariffs, though some began to question the continued vitality of the filed rate doctrine in the wake of the FCC's permissive de-tariffing policy for CLECs. Compare, e.g., Sancom, Inc. v. Qwest Commc'ns Corp., 643 F. Supp. 2d 1117, 1126 (D.S.D. 2009), reconsideration granted in part, 2010 WL 960005 (D.S.D. Mar. 12, 2010); Splitrock Props., Inc. v. Qwest Commc'ns Corp., 2009 WL 2827901, at *2 (D.S.D. Aug. 28, 2009); MCI WorldCom Network Servs., Inc. v. Paetec Commc'ns, Inc., 2005 WL 2145499, at *5 (E.D. Va. Aug. 31, 2005); Freedom Ring Commc'ns, LLC v. AT&T Corp., 229 F. Supp. 2d 67, 69-70 (D.N.H. 2002), with N. Valley Commc'ns v. Qwest Commc'ns Corp., 659 F. Supp. 2d 1062, 1070 (D.S.D. 2009) (finding it premature to apply the filed rate doctrine to a CLEC's unjust enrichment claim based on the uncertainty as to whether CLEC provided services to "end users" as to be covered by the tariffs).

In Farmers II, the FCC held that the local exchange carrier could not charge the interexchange carrier switched access rates under its tariff where the traffic did not constitute "switched access" within the meaning of the tariff. Farmers II, 24 FCC Rcd. at 14813 ¶ 26. In a cryptic footnote, however, the FCC suggested that the local exchange carrier was not necessarily

"precluded from receiving any compensation at all for the services it has provided to [the interexchange carrier]." Farmers II, 24 FCC Rcd. at 14812 n.96. In these murky regulatory waters, it is unremarkable that courts—including those cited by Plaintiffs—opted to stay their hand not because they determined that compensation in equity was allowed as a matter of law, but pending additional guidance from the FCC as to whether and on what basis a local exchange carrier could obtain compensation from interexchange carriers for services not covered by their tariffs. See, e.g., Qwest Commc'ns Co., LLC, 2010 WL 2772442, at *6-7; Splitrock Props., Inc., 2010 WL 1329634, at *9; Sancom, Inc., 2010 WL 960005, at *10.

Although the Farmers II parties resolved their dispute before the FCC had a further chance to opine on the import of footnote 96 in a damages proceeding, see Qwest Commc'ns Corp. v. Farmers & Merchs. Mut. Tel. Co., 27 FCC Rcd. 9377 (2012), subsequent decisions by the FCC in other access stimulation cases brought additional clarity. In its January 2011 order denying Plaintiffs' formal complaint in this action, the FCC explained as follows:

> [Farmers II] does not hold that a carrier is always entitled to some compensation for a service rendered, even if the service is not specified in its tariff. [Farmers II] merely holds that a carrier may be entitled to some compensation for providing a non-tariffed service, depending on the totality of the circumstances.

All Am. Tel. Co. v. AT&T Corp. ("Denial Order"), 26 FCC Rcd. 723, 731 ¶ 19 (2011) (emphasis in original). To be fair, the Denial Order's gloss did not specify what circumstances might entitle a local exchange carrier to compensation for non-tariffed services, and some courts continued to adhere to the notion that local exchange carriers "should receive some form of compensation for access stimulation-related services" in the absence of a tariff or negotiated agreement. See, e.g., N. Valley Commc'ns, L.L.C. v. Qwest Commc'ns Corp., 2012 WL 2366236, at *7 (D.S.D. June 20, 2012) (citing Farmers II, 24 FCC Rcd. at 14812 n.96) (musing that it "seems unlikely that the FCC foreclosed any compensation for services plaintiff provided

outside of the tariff or a negotiated contract").

But to the extent that courts (and CLECs) have read a gap into the regulatory regime that would permit a CLEC to be compensated for access services not covered by a tariff or a negotiated contract, the 2013 Liability Order and 2015 Damages Order have plugged it. As the FCC reiterated, "until a CLEC files valid interstate tariffs under Section 203 of the [Communications] Act or enters into contracts with IXCs for the access services it intends to provide, it lacks authority to bill for those services." Liability Order, 28 FCC Rcd. at 3494 ¶ 37. The Damages Order put an even finer point on it, noting that CLECs are "entitled to compensation for access services only 'through a valid tariff or a contract negotiated with AT&T'" and that the Liability Order "did not create a 'regulatory gap' entitling [Plaintiffs] to pursue alternate damage theories." Damages Order, 30 FCC Rcd. at 8963 n.50.[5]

In sum, a CLEC may charge for interstate access services only by filing and complying with a valid interstate tariff with rates benchmarked to the competing ILEC, or by negotiating an agreement with the interexchange carrier. If no agreement is negotiated, then the CLEC "remains subject to § 203 and the filed rate doctrine" "unless and until a CLEC has avoided the tariff filing requirement by entering into such an agreement." CallerID4u, Inc., 880 F.3d at 1062-63. As relevant here, a CLEC may "tariff access charges only if those charges are for transporting calls to or from an individual or entity to whom the CLEC offers service for a

---

[5] This discussion occurred in the context of the FCC's statement that even if Plaintiffs could seek such compensation in equity, they "failed to establish the necessary elements for unjust enrichment, because they did not provide a service to, or confer a benefit on, AT&T." Damages Order, 30 FCC Rcd. at 8963 ¶ 13. Although the D.C. Circuit nullified the FCC's discussion insofar as it touched upon Plaintiffs' "ability to satisfy the 'necessary elements for unjust enrichment,'" All American III, 867 F.3d at 95, the statements cited above pertain to whether the Communications Act bars Plaintiffs' claims—a question separate from the merits of the state law claims. Cf. Wyeth, 555 U.S. at 576-77 (noting that while courts are not required to defer to an agency's conclusion on preemption, an agency's "explanation of how state law affects the regulatory scheme" may be afforded persuasive weight). Indeed, the D.C. Circuit implicitly recognized this distinction in noting that the preemption question and the merits of Plaintiffs' state law claims were to be decided by this Court in the first instance. All American III, 867 F.3d at 95 & n.5.

fee." Qwest Commc'ns Co., LLC v. N. Valley Commc'ns, LLC, 26 FCC Rcd. 8332, 8336 ¶ 7

(2011); accord All American III, 867 F.3d at 85 ("[I]t is now 'well-settled that a [local exchange

carrier] cannot bill an [interstate exchange carrier] under its tariff for calls 'terminated' at a

conference call bridge when the conference calling company does not pay a fee for th[ose]

services.'" (citation omitted) (second, third, and fourth alterations in original)).  Put differently, if

a CLEC "wishes to charge [an IXC] for terminating calls to entities that pay no fees, it must do

so through a negotiated contract." Qwest Commc'ns Co., LLC, 26 FCC Rcd. at 8338 ¶ 11.  But

while CLECs "have the option of negotiating contracts, once a CLEC files a tariff, a CLEC may

not then negotiate separate contracts for interstate access." AT&T Corp., 207 F. Supp. 3d at

1029; see also Denial Order, 26 FCC Rcd. at 730 n.47 ("[P]arties are precluded from negotiating

separate agreements that affect the rate for services once a tariff has been filed." (citation and

quotation marks omitted)).

   Applying these principles here, this Court concludes that Plaintiffs' state law

claims are preempted.  As the FCC found, Plaintiffs negotiated no agreement with AT&T—

though they certainly could have. Liability Order, 30 FCC Rcd. at 8963 n.50.  Therefore, they

were subject to § 203 and the filed rate doctrine.  And once Plaintiffs filed their tariffs, those

tariffs provided the only means of compensation for any access services.  But Plaintiffs cannot

recover via tariff because the FCC "has determined that a CLEC may not impose switched

access charges pursuant to tariff unless it is providing interstate switched exchange access

services to its own end users, and that an entity to whom the CLEC offers free service is not an

end user." Qwest Commc'ns Co., LLC, 26 FCC Rcd. at 8338 ¶ 11.

   Allowing Plaintiffs to recover under quasi-contractual theories in the absence of a

negotiated agreement would circumvent the filed rate doctrine and FCC rulings in two ways.

First, it is tantamount to the imposition of access charges by judicial fiat for services that do not comply with filed tariffs.  Second, it effectively requires this Court to determine a reasonable rate for the access services Plaintiffs billed AT&T under their tariffs.  Accord, e.g., AT&T Corp., 207 F. Supp. 3d at 1036; Great Lakes Commc'n Corp., 2015 WL 12551192, at *23; see also Peerless Network, Inc. v. MCI Commc'n Servs., Inc., 2015 WL 2455128, at *8-10 (N.D. Ill. May 21, 2015) (collecting cases).  In a similar vein, permitting CLECs to obtain compensation outside of a tariff or a negotiated agreement undermines congressional goals of uniformity because "CLECs could receive different rates either because different state equitable principles applied or because different courts weighed the equities differently."  CallerID4u, Inc., 880 F.3d at 1063.  Valid tariffs and negotiated agreements ensure reasonable rates via the benchmarking rule or competitive market forces—state law equitable claims implicate neither.  Because there is no other means of compensation other than by negotiated agreement or the FCC's regulatory regime, Plaintiffs' Second Amended Complaint must be dismissed.[6]

In opposition, Plaintiffs cling to outdated precedent that is now unpersuasive. Plaintiffs rely on a case from this District that analyzed whether the filed rate doctrine precluded a carrier's recovery under unjust enrichment for connecting Voice over Internet Protocol (or VoIP) calls.  See Manhattan Telecomms. Corp. v. Global NAPS, Inc., 2010 WL 1326095 (S.D.N.Y. Mar. 31, 2010).  Citing the lack of agency guidance and conflicting judicial rulings as to whether VoIP services are "information services," which—unlike telecommunications

_____

[6]     For the first time at oral argument and in a supplemental letter, Plaintiffs posited that the Ninth Circuit's 2003 decision in Ting—purportedly "cited with approval and discussed extensively" in CallerID4u—confirmed that state law claims would proceed in the absence of a valid tariff.  The CallerID4u panel rejected a similar argument made by a CLEC.  Ting considered "whether federal law preempted state common remedies in the context of a completely detariffed and competitive marketplace" and concluded that in an environment where the federal rate-filing requirement was completely inapplicable, state law could not interfere with a federal tariffing regime. CallerID4u, 880 F.3d at 1057 (emphasis added).  This is not the case with permissively de-tariffed CLECs, who remain subject to the federal rate-filing system in the absence of a negotiated agreement.

services—are not subject to the Communications Act's access charge scheme, the court declined to apply the filed rate doctrine.  <u>Glob. NAPS, Inc.</u>, 2010 WL 1326095, at *2.  The court concluded, however, that the "inability to apply the tariff regime as it stands does not preclude [plaintiffs'] entitlement to recover in equity."  <u>Glob. NAPS, Inc.</u>, 2010 WL 1326095, at *3.  But <u>Global NAPS</u> is readily distinguishable.  The court reasoned that the filed rate doctrine ought not to have any preemptive effect because VoIP services may not be subject to the FCC's tariffing regime at all.  But this rationale offers minimal persuasive force because the services at issue in this case <u>are</u> subject to access charges.  Thus, there is no similar tension in arguing that services are not subject to the statutory rate system while simultaneously contending that the statutory rate system bars equitable claims to receive compensation for those services.  <u>See</u> <u>Global NAPS</u>, 2010 WL 1326095, at *3.  Likewise, the court's determination that it was "merely filling the gap left by the FCC's pronouncements" without usurping the FCC's rate-making authority offers no refuge where the FCC has spoken.  <u>Global NAPS</u>, 2010 WL 1326095, at *3.

Certainly, some decisions have held that the filed rate doctrine does not preempt state law equitable claims for services that are not covered by a tariff or negotiated contract, even after the FCC's decisions in this action.  <u>See</u> <u>N. Valley Comm'cns, L.L.C. v. AT&T Corp.</u>, 2015 WL 11675666 (D.S.D. Aug. 20, 2015).  There, the court first noted the uncertainty in how the filed rate doctrine applied to CLECs after permissive de-tariffing, explaining that the "filed-rate doctrine was developed in an era of greater regulation during which all carriers were required to file tariffs."  <u>N. Valley Commc'ns</u>, 2015 WL 11675666, at *4 (citing, <u>inter alia</u>, <u>In re Hyperion Telecomms., Inc. Petition Requesting Forbearance</u>, 12 FCC Rcd. 8596, 8611 ¶ 30 (1997)).  It then reasoned that the filed rate doctrine does not bar state equity claims for services that fall outside the filed tariff, pointing to "subsequent cases [that] have found that the filed-rate doctrine

does not apply when a telecommunications carrier supplied services falling outside the filed tariff." N. Valley Commc'ns, 2015 WL 11675666, at *4 (citing, inter alia, Farmers & Merchs. Mut. Tel. Co., of Wayland, Iowa v. FCC, 668 F.3d 714, 722-23 (D.C. Cir. 2011)). Based on these premises, it concluded that the filed rate doctrine did not preempt the CLEC's state law claims. N. Valley Commc'ns, 2015 WL 11675666, at *5.

In this Court's view, the reasoning and cases cited in North Valley Communications are unpersuasive. As an initial matter, though the applicability of the filed rate doctrine may have been uncertain in the nascent stages of permissive de-tariffing when the FCC decided Hyperion, subsequent decisions by the FCC and federal courts have established that absent a negotiated contract, CLECs remain subject to § 203 and the filed rate doctrine. E.g., CallerID4u, Inc., 880 F.3d at 1062-63. The D.C. Circuit's opinion in the Farmers proceedings is not to the contrary. In that case, the D.C. Circuit explained that the filed rate doctrine did not apply because the traffic did not involve end users under the tariff, and thus did not implicate tariffed services. Farmers, 668 F.3d at 722. But the court included this discussion in response to a CLEC's invocation of the filed rate doctrine to support its contention that an interexchange carrier that accepts service under a tariff must pay the tariffed rate. See Farmers, 668 F.3d at 721-22. The D.C. Circuit rejected this argument, clarifying that because the "service was outside of the tariff . . ., the filed rate doctrine could not protect [the CLEC] from liability to [the interexchange carrier]." Farmers, 668 F.3d at 723; see Farmers, 668 F.3d at 722 ("The [FCC] has long instructed that a service that does not 'fall within the plain meaning' of the tariff is not governed by the tariff whether or not it is 'functionally similar' to a tariffed service." (citations omitted)).

With that context, Northern Valley Communications says little about whether the

FCC's tariff regime bars all <u>alternative</u> means of compensation for services not covered by a tariff (or contract).  And while the <u>Northern Valley Communications</u> court inferred that the "FCC does not interpret its rules as preempting all avenues of recovery when a service falls outside a filed tariff and no negotiated contract applies," such an inference is weakened by the FCC's subsequent clarifications in the <u>Liability Order</u> and <u>Damages Order</u>.  <u>See</u> <u>N. Valley Commc'ns</u>, 2015 WL 11675666, at *6 (citing <u>Farmers II</u>, 244 FCC Rcd. at 14812 n.96; <u>Denial Order</u>, 26 FCC Rcd. at 731 ¶ 19)).  In short, the fact that a CLEC's access services fall outside a filed tariff does not necessarily bring it outside the FCC's regulatory purview.  Rather, CLECs may charge an interexchange carrier for access services <u>only</u> through a negotiated contract or a valid filed tariff.  If a CLEC wishes to charge a higher rate than the benchmark or for services to non-paying end users, the FCC requires that it do so through a negotiated contract.  The Second Circuit explained as follows:

> The filed rate doctrine is motivated by two 'companion principles'—(1) preventing carriers from engaging in price discrimination as between ratepayers (the 'nondiscrimination strand') and (2) preserving the exclusive role of federal agencies in approving rates for telecommunications services that are 'reasonable' by keeping courts out of the rate-making process (the 'nonjusticiability strand'), a function that the federal regulatory agencies are more competent to perform.

<u>Marcus</u>, 138 F.3d at 58 (citation omitted).  Allowing a CLEC to recover damages through state law equitable claims—which the FCC may not pass on—would "unnecessarily enmesh the courts in the rate-making process."  <u>Wegoland Ltd. v. NYNEX Corp.</u>, 27 F.3d 17, 19 (2d Cir. 1994).  This, a judge cannot do.  <u>Marcus</u>, 138 F.3d at 61 ("The filed rate doctrine prevents more than judicial rate-setting; it precludes any judicial action which undermines agency rate-making authority.")

> The filed rate doctrine must be "applied strictly to prevent a plaintiff from bringing a cause of action even in the face of apparent inequities whenever either the

nondiscrimination strand or the nonjusticiability strand underlying the doctrine is implicated by the cause of action the plaintiff seeks to pursue." Marcus, 138 F.3d at 59. This Court is cognizant that the filed rate doctrine, where it applies, is "rigid and unforgiving." Simon v. KeySpan Corp., 694 F.3d 196, 205 (2d Cir. 2012). The Second Circuit has also expressed sympathy "to the argument that, at least in the telecommunications industry, strict adherence to the filed rate doctrine is no longer required." Marcus, 138 F.3d at 62. Irrespective of whether the filed rate doctrine should apply, "[u]nless Congress or the Supreme Court re-examines the doctrine, we are bound to enforce it." Fax Telecommunicaciones, Inc. v. AT&T, 138 F.3d 479, 491 (2d Cir. 1998). And while Plaintiffs' objections that the FCC had enforced filed tariffs in access stimulation disputes before abruptly reversing its position in 2009 is noted, the wisdom of the FCC's stance on access stimulation is well outside the expertise and constitutional role of the courts. Because this Court finds that AT&T is entitled to judgment as a matter of law based on the preemption of Plaintiffs' state law claims, it need not reach AT&T's other arguments for dismissal of the Second Amended Complaint.

II.      AT&T's Motion for Summary Judgment on AT&T's Counterclaims

        A.  Merits

              AT&T moves for summary judgment on its counterclaims under 47 U.S.C. §§ 201(b) and 203.[7] In support of its motion, AT&T points to the FCC's Liability Order, which determined that Plaintiffs violated §§ 203 and 201 by billing for services not provided pursuant to valid and applicable tariffs, and that Plaintiffs violated § 201 by operating as sham carriers

---

[7]      AT&T asserted the at-issue counterclaims in its answer to Plaintiffs' first amended complaint. (See Answer and Amended Counterclaims of Defendant AT&T Corp. to Plaintiffs' First Amended Complaint, ECF No. 48.) In view of AT&T's motions for dismissal of the Second Amended Complaint and for summary judgment on its counterclaims, the parties consented to adjourning AT&T's deadline to answer the Second Amended Complaint and re-assert any existing counterclaims until after this Court resolved AT&T's motions.

created to capture access fees that they would not otherwise have been able to obtain pursuant to lawful tariffs. See generally Liability Order, 28 FCC Rcd. at 3487 ¶ 24 – 3495 ¶ 38. AT&T initially sought—among other things—damages to be determined at trial, interest, and attorney's fees. (See Answer & Amended Counterclaims of Defendant AT&T Corp. to Plaintiffs' First Amended Complaint, ECF No. 48 ("Amended Answer & Counterclaims") ¶¶ 48, 55, 60.) However, it now seeks only the $252,496.37 awarded by the FCC's Damages Order, along with prejudgment interest.

        Here, AT&T satisfies its burden to demonstrate entitlement to judgment as a matter of law. AT&T's counterclaims assert violations of §§ 201(b) and 203(c) of the Communications Act. In relevant part, § 201(b) provides that "[a]ll charges, practices, classifications, and regulations for and in connection with [interstate] communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful . . . ." 47 U.S.C. § 201(b). Section 203(c) prohibits carriers from "engag[ing] or participat[ing] in [interstate wire or radio] communication unless schedules have been filed and published in accordance with the provisions of this chapter and with the regulations made thereunder," and also that "no carrier shall . . . charge, demand, collect, or receive a greater or less or different compensation for such communication, or for any service in connection therewith, . . . than the charges specified in the schedule then in effect . . . ." 47 U.S.C. § 203(c).

        This Court concludes that the FCC conclusively resolved the liability issues relating to AT&T's Communications Act counterclaims—in particular, it found that Plaintiffs violated §§ 203(c) and 201(b) by charging for terminating switched access services that were provided dehors the filed tariffs, and that Plaintiffs violated § 201(b) by operating as sham

entities for the purpose of extracting inflated access charges. Accord MCI Telecomms., Inc. v. T.A. Commc'ns, Inc., 40 F. Supp. 2d 728, 734 (D. Md. 1999) (finding the FCC's determination as to Communications Act claims following a primary jurisdiction referral to be conclusive, where FCC reviewed those claims and issued a final order).

In response, Plaintiffs offer several arguments, none of which raise a genuine dispute of material fact to be resolved by the fact-finder, and all of which are unpersuasive.[8] First, Plaintiffs assert that summary judgment on the counterclaims must be denied because violations of individual provisions of the Communications Act do not per se furnish private causes of action. They point to the FCC's purported treatment of Plaintiffs' various statutory violations as a single claim.[9]

While somewhat abstruse, Plaintiffs appear to make two discrete arguments: (1) conduct alleged to violate a provision of the Communications Act cannot furnish a private cause of action unless the FCC has determined that such conduct violates the statute; and (2) the conduct for which the FCC found liability cannot be disaggregated into more than one independent cause of action. The first contention holds no water—as the second contention implicitly recognizes, the FCC has determined precisely that the conduct on which the FCC's liability determination rests violates §§ 201(b) and 203. See, e.g., Liability Order, 28 FCC Rcd. at 3490 ¶ 30 (discussing Total Telecomm. Servs., Inc. v. AT&T Corp., 16 FCC Rcd. 5726 (2001), aff'd in part and remanded in part, 317 F.3d 227 (D.C. Cir. 2003)); All American III, 867

---

[8]     Plaintiffs also urge denial of summary judgment as to the third counterclaim because this Court did not reinstate it on reconsideration of its prior order granting Plaintiffs' motion for judgment on the pleadings. This claim is without merit. The initial iteration of the third counterclaim related to erstwhile-Plaintiff Great Lakes Communication Corp., who was dropped from this case upon filing of the Second Amended Complaint. Moreover, this Court's order granting AT&T's motion for reconsideration makes clear that the sham entity counterclaim—i.e., the third counterclaim in AT&T's amended pleading—was to be stayed pending referral to the FCC.

[9]     The administrative complaint filed by AT&T alleges violations of §§ 203 and 201(b) in two separate counts. See Liability Order, 28 FCC Rcd. at 3477 ¶ 1.

F.3d at 85 (observing that starting in 2010, the FCC issued a series of orders "that local exchange carriers could not charge interexchange carriers to connect long-distance calls to a non-paying end user").  Moreover, AT&T was certainly entitled to plead violations of different statutory proscriptions based on different conduct as separate counts.  See Fed. R. Civ. P. 8; cf. United States v. Cohn, 682 F. Supp. 209, 220 (S.D.N.Y. 1988).  The point is that regardless of whether its counterclaims were most properly pled as one, two, or three counts, the FCC found that Plaintiffs violated §§ 201(b) and 203 by billing for access services not provided pursuant to a valid or applicable tariff and operating as a sham entity to collect inflated access charges.

Second, Plaintiffs reiterate that a pre-answer and pre-discovery summary judgment motion is premature.  As previously discussed, however, this line of reasoning lacks merit because the New York summary judgment standard is wholly inapplicable, the Federal Rules do not categorically bar such a motion, and the discovery requested in Plaintiffs' Rule 56(d) affidavit bears no apparent relation to the merits of AT&T's counterclaims.  Plaintiffs' invocation of New York's "well-established" rule that summary judgment should not be granted if there is a meritorious counterclaim for an amount equal to or greater than the claim is also unavailing.  (See Plaintiffs' Opp. at 39 (citing Ill. McGraw Elec. Co. v. John J. Walters, Inc., 164 N.E.2d 872 (N.Y. 1959)).)  Independent of the fact that Plaintiffs' claims lack merit, that principle applies when a court grants partial summary judgment dismissing a claim that is inextricably interwoven with a counterclaim that is allowed to remain.  See Seneca Trucking Co. v. D.H. Overmeyer Co., 320 N.Y.S.2d 314, 315 (N.Y. App. Div. 1971).

Third, Plaintiffs' contention that the FCC's damages award was not based on any showing of actual injury to AT&T presupposes that the measure of damages should have been determined based on a showing of AT&T's actual pecuniary loss and not the amount that AT&T

paid on invoices that it honored.  But Plaintiffs raised this precise argument on appeal to the D.C. Circuit, which in affirming the FCC's damages award, held that AT&T "met [its] burden . . . [to] prove a financial loss that was caused by the alleged violation."  All American III, 867 F.3d at 91-92.  In effect, adopting Plaintiffs' argument would impermissibly require this Court to sit in review of the Damages Order.

Finally, Plaintiffs erroneously claim that AT&T's suggestion of different ways to calculate prejudgment interest raises an issue of fact precluding summary judgment.  It is well-settled that the decision to award prejudgment interest rests within the trial court's broad discretion.  SEC v. Contorinis, 743 F.3d 296, 307-08 (2d Cir. 2014); see also Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co., 1999 WL 258263, at *1 (S.D.N.Y. Apr. 29, 1999) (collecting cases).  That courts have applied different methods of calculating prejudgment interest merely reflects an exercise of this judicial discretion—it hardly suggests that the discretionary rate of prejudgment interest to be applied is a question of fact to be decided by the fact-finder, much less one material to the merits of AT&T's counterclaims.

B.  Prejudgment Interest

In determining whether prejudgment interest is appropriate, courts consider "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved and/or (iv) such other principles as are deemed relevant by the court."  Wickham Contracting Co. v. Local Union No. 3, 955 F.2d 831, 833-34 (2d Cir. 1992).  Even where the relevant federal statute is silent on prejudgment interest, the Supreme Court and the Second Circuit have upheld such awards based on one or more of the above-enumerated considerations, unless congressional intent points to the contrary or if statutory damages are fully compensatory

or punitive in nature. See Wickham Contracting Co., 955 F.2d at 834-36 (citations omitted). Here, while the Communications Act does not speak to prejudgment interest, courts and the FCC have recognized the necessity of prejudgment interest to fully compensate parties aggrieved by violations of the statute. E.g., Nat'l Commc'ns Ass'n, 1999 WL 258263, at *1; ITT World Commc'ns, Inc. v. W. Union Tel. Co., 598 F. Supp. 1435, 1437 (S.D.N.Y. 1984).

The considerations outlined in Wickham also support an award of prejudgment interest. AT&T has—as the FCC found and the D.C. Circuit affirmed—suffered actual harm from Plaintiffs' violations of the Communications Act for which the FCC concluded that damages in the amount of AT&T's loss were appropriate. Moreover, as courts in this Circuit have recognized, the Communications Act establishes a remedial scheme to compensate those injured by carriers who violate the statute. See Nat'l Commc'ns Ass'n, 1999 WL 258263, at *5 (citing 47 U.S.C. § 206). Finally, the equities weigh in favor of awarding prejudgment interest. The FCC determined that Plaintiffs were "sham" CLECs created to capture access revenues that could not otherwise be obtained by lawful tariffs, and that Plaintiffs never intended to operate as bona fide CLECs. Liability Order, 28 FCC Rcd. at 3487 ¶ 24, 3488 ¶¶ 25-26; cf. Wickham Contracting Co., 955 F.2d at 834-35 (observing that prejudgment interest may be inappropriate "when the defendant acted innocently and had no reason to know of the wrongfulness of his actions"). Although Plaintiffs protest that AT&T and the FCC conspired to delay the FCC proceedings to Plaintiffs' detriment, they do not point to any evidence in support of their contention. Thus, in this Court's discretion, prejudgment interest is warranted. See Nat'l Commc'ns Ass'n, 1999 WL 258263, at *5 (applying the precept that "[w]here no circumstances exist to justify denial of prejudgment interest, . . . 'it is ordinarily an abuse of discretion not to include prejudgment interest'" (citing Gierlinger v. Gleason, 160 F.3d 858, 873 (2d Cir. 1998)).

But the inquiry does not end there. District courts also exercise discretion in determining the rate of prejudgment interest as well as the date on which interest accrues. Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc., 67 F.3d 1063, 1071-72 (2d Cir. 1995); see Jones v. UNUM Life Ins. Co. of Am., 223 F.3d 130, 139 (2d Cir. 2000) (explaining that "the same considerations that inform the court's decision whether or not to award interest at all should inform the court's choice of interest rate"). With respect to a suitable rate of prejudgment interest, this Court is guided by the Second Circuit's admonition that awards of prejudgment interest should not overcompensate or result in a windfall to the aggrieved party. See Wickham Contracting Co., 955 F.2d at 834. AT&T proposes the New York statutory interest rate of nine percent per annum or the interest rates specified in Plaintiffs' FCC tariffs for late payments, both of which have been applied to claims for unpaid tariff charges. See, e.g., AT&T Corp. v. Cmty. Network Servs., Inc., 1999 WL 1267457, at *6 (S.D.N.Y. Dec. 29, 1999) (applying New York statutory rate); WorldCom, Inc. v. Voice Plus Int'l, Inc., 2000 WL 12146, at *2-3 (S.D.N.Y. Jan. 6, 2000) (applying interest rate specified in tariff filed with the FCC). Other measures include the interest rates set forth in 26 U.S.C. § 6621 for underpayment and overpayment of taxes and the interest rate prescribed by 28 U.S.C. § 1961 for post-judgment interest. See Nat'l Commc'ns Ass'n, 1999 WL 25823, at *5.

Here, the interest rates for overpayment of taxes is appropriate. In particular, 26 U.S.C. § 6621 sets forth "five rates of interest, all functions of the Treasury's rate for short-term borrowing." ACS of Anchorage, Inc. v. FCC, 290 F.3d 403, 414 (D.C. Cir. 2002). These rates differ based on "whether taxes are overpaid or underpaid, whether the party is an individual or corporation," and the magnitude of overpayment or underpayment. ACS of Anchorage, 290 F.3d at 414. The interest rate for non-large corporate overpayments adequately compensates

AT&T for the loss of use of its money that it paid to Plaintiffs.  Accord In re Total Telecomms.

Servs., Inc., 16 FCC Rcd. 5726, 5746 ¶ 49 (2001) (awarding prejudgment interest at the IRS rate

for corporate overpayments for violation of 47 U.S.C. § 201(b) based on an unreasonable scheme

to inflate access charges).  Indeed, the FCC has on several occasions used the applicable IRS

refund rate in Communications Act cases that involve "overcharging or improperly withheld

payments."  Nat'l Commc'ns Ass'n, 1999 WL 258263, at *6; see also ACS of Anchorage, Inc.,

290 F.3d at 414 (noting that the FCC "apparently co-opts these rates for the calculation of

prejudgment interest").

        This Court observes that the New York statutory rate is inapt because AT&T's

counterclaims involve substantive violations of a federal statute without any meaningful

connection to New York law.  See In re Palermo, 739 F.3d 99, 107 (2d Cir. 2014) (endorsing the

framework employed by courts in this Circuit of determining the rate of prejudgment interest by

"look[ing] to the source of law underlying [the] claims").  Moreover, applying the interest rates

set forth in Plaintiffs' tariffs for late payments seems particularly inappropriate because AT&T

sought their invalidation—not to mention that those rates may well overcompensate AT&T.

(See Declaration of David I. Toof, Ph.D, ECF No. 166 ("Toof Decl.") ¶¶ 7-10 (calculating

$1,563,378.97 in prejudgment interest for $252,496.37 in damages).)

        Accordingly, AT&T shall be entitled to prejudgment interest on the $252,496.37

awarded by the FCC to accrue from the dates the payments were made.  See Nat'l Commc'ns

Ass'n, 1999 WL 258263, at *6 (noting that under federal law, interest accrues from the time of

injury).  The amount of such interest shall be calculated based on the applicable IRS refund rate

throughout the period of accrual.  Plaintiffs' insinuation that the FCC proceedings were

intentionally (and with animus) protracted by the FCC and AT&T to drain Plaintiffs' resources

and allow AT&T to win by default deserves one final remark. While Plaintiffs offer nothing more than innuendo, even if they were correct, awarding interest from the dates the payments were made to judgment is within the bounds of this Court's discretion given that Plaintiffs retained the use of AT&T's payments throughout the entire period. Cf. SEC v. First Jersey Secs., 101 F.3d 1450, 1477 (2d Cir. 1996) (noting in the SEC enforcement context that "[e]ven if defendants were correct that the present litigation was protracted through some fault of the SEC, defendants plainly had the use of their unlawful profits for the entire period").

## CONCLUSION

For the foregoing reasons, AT&T's motions for summary judgment are granted. The parties are directed to submit a proposed judgment consistent with this Opinion & Order by September 25, 2018. The Clerk of Court is directed to terminate the motions pending at ECF Nos. 159 and 163 and mark this case as closed.

Dated:  September 10, 2018
        New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

44